Derrell N. **CHANDLER** and
Harry L. Dawson,

v.

**UNITED STATES of America.**

No. 4:92–CV–543–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

Aug. 22, 1994.

Derrell N. Chandler, pro se.

Harry L. Dawson, pro se.

Stephen E. Handler, Daniel R. Unumb, U.S. Dept. of Justice, Civ. Div. Torts Branch, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

This action for malicious prosecution under the Federal Tort Claims Act ("FTCA") has presented the Court with one of the most unpleasant decisions in its memory. In a trial lasting some two weeks, witnesses often directly contradicted each other and the General Services Administration ("GSA") in the Fort Worth area was shown to be rife with conflict and resentment among union, management, and purportedly neutral investigative personnel. Few of the major actors involved emerged unsullied.

Having sorted through the evidence, the Court is persuaded that the prosecution of Plaintiffs Derrell N. Chandler and Harry L. Dawson for perjury and obstruction of justice was maliciously caused by a GSA investigator who, frustrated when he could not prove Dawson guilty of conspiracy to harm a GSA official and unable to secure Chandler's aid in that regard, set out to prove both men guilty of other charges, regardless of the truth. The Court also finds that plaintiffs' prosecution resulted from a lack of prosecutorial investigation and oversight. While these latter deficiencies are not directly actionable under the FTCA, they permitted the investigator to play an inflated role in the prosecution and to present as fact his own biased assumptions. Based, in particular, on the investigator's intentionally false, misleading and incomplete testimony to the grand jury, the Court concludes that the government is liable to the plaintiffs for malicious prosecution.

### FINDINGS OF FACT

Determining the facts in this case has been complicated by conflicting testimony and the absence of the two key witnesses upon whom the government relied in plaintiffs' underlying criminal prosecution. Plaintiffs, proceeding *pro se*, had the awkward task of both testifying and acting as counsel. The Court's findings of facts are based on a careful consideration of the various witnesses' credibility, the extensive documentary evidence (including audio tapes), the degree to which the latter corroborated the former, and the reasonable inferences drawn from the established facts.

1. Plaintiffs Dawson and Chandler have both worked for the GSA, Region 7, for a number of years. During the events at issue in this lawsuit, Dawson also was the President of the American Federation of Government Employees ("AFGE" or "union") Local 2488 and the Regional Vice–President of the National Council of GSA Locals for the

AFGE. Chandler was the Secretary–Treasurer of AFGE Local 2488.

2. From December 1983 to February 24, 1989, Warren T. Lander was a Crime Prevention Specialist with the Federal Protective Service of the GSA. In that position, Lander was issued the credentials of a federal law enforcement officer to be used in emergency situations or when specifically authorized by his supervisors.

3. In June 1988, the GSA charged Lander with sexual harassment and several other infractions, for which he ultimately received a fourteen-day suspension. Lander believed that Dawson, in his role as union president, prevented him from challenging the charges. As a result, Lander resented and distrusted Dawson and filed an unfair labor practice complaint against him.[1]

4. On February 24, 1989, the GSA fired Lander for alleged misuse of his federal law enforcement credentials in October 1988. On March 8, 1989, Lander turned in his Crime Prevention Specialist credentials to the Federal Protective Service. The GSA did not reissue Lander those credentials or make any assignments where he had to use law enforcement authority after that date.

5. Beginning in February 1989, Chandler served as Lander's union representative in challenging Lander's discharge before the Merit Systems Protection Board ("MSPB"). In this capacity, Chandler took depositions and submitted written materials to the MSPB on Lander's behalf. Throughout the course of the MSPB case, Lander suffered back pain and took various medications, including Tylenol III, which included codeine. Due to his pain and the need to take medication, Lander requested numerous breaks in depositions he attended. Chandler was aware that Lander had a back problem and was taking medication during this time.

6. On the afternoon of April 20, 1989, Chandler and a GSA representative deposed Lander. Lander took several breaks in the deposition, one in order to take medication. During one break, Lander had an argument with and expressed hostility toward Larry Hathaway, the personnel director for Region 7 of the GSA. Lander believed that Hathaway was at least partly responsible for his discharge.

7. That evening, a meeting of the AFGE Local was held and a vote was taken by the members. Although neither Lander nor Alfred Soto, another GSA employee, had been active in the union during the previous few years, both attended the meeting at the request of Dawson or Chandler, who desired a good turn-out for the vote. Lander arrived at the meeting late, appeared to be glassy-eyed and, when it came his turn to give his opinion of the issue at hand, spoke instead about an unrelated subject—the occurrence on which his discharge was based.

8. Following the meeting Dawson issued an open invitation to the members to have dinner at the Rig Restaurant ("Rig"). Only Lander and Soto, neither of whom was a personal friend of Dawson, accepted. The men each drove to the Rig in their individual vehicles. After being assigned a table near the cashier's desk, the three men went to the salad bar. Dawson and Lander spoke to each other; Soto was not paying much attention to the discussion at that time.

9. At the salad bar or early in the meal, Lander complained about Larry Hathaway. Dawson, who as a long-time union representative felt it best to let Lander vent his frustration, agreed with Lander that something ought to be done about Hathaway. Dawson, known for his practical joking, also decided to play a joke. He asked Lander and Soto to each give him twenty dollars. When they did, he said something to the effect of "you're now involved." The men talked about Hathaway and how nice it would be if he got roughed up. Lander said he knew some people who could do the job. Dawson said they would need a photograph. Soto said he had a camera. Lander said he could get a photo. At some point Dawson congratulated the others and said they had just bought his dinner. After some more joking, he then gave Lander and Soto back twenty dollars each. The entire conversation was carried on in a joking manner, and the men departed the restaurant laughing.

***

1. Lander eventually dismissed his complaint against Dawson.

10. In the days immediately following the Rig conversation, Dawson made no attempt to contact Lander or Soto to obtain a photo of Hathaway or otherwise follow up on their conversation.

11. The morning after the Rig conversation, Lander informed Brian Murphy, a Special Agent of the Office of Inspector General of the GSA ("IG"), about the conversation at the Rig. Lander represented that Dawson had initiated the discussion about Hathaway and that he believed Dawson was serious. Lander signed an affidavit to that effect. On the same day, Murphy informed J. Michael Worley, an Assistant United States Attorney ("AUSA"), of Lander's disclosure. In the next few days, Richard Herr, the Regional Inspector General of the IG, instructed Murphy to investigate the veracity of Lander's April 21 disclosure.

12. In an attempt to corroborate Lander's story, Murphy arranged for Lander to deliver a photo of Hathaway to Dawson. Murphy recorded the conversations that Lander initiated with Dawson regarding the delivery. In the first conversation, on April 25, 1985, Lander telephoned Dawson and told him he had a picture of Hathaway. Dawson was busy with union matters and did not want to deal with Lander. Nevertheless, because Lander appeared to be fixated on Hathaway, Dawson thought it easiest to go along with his apparent desire to deliver a photo. At Lander's suggestion, Dawson agreed to meet him downstairs the next morning. When Lander said he did not know if the conversation at the Rig was serious, Dawson simply said he did not want to discuss it over the phone.

13. On the morning of April 26, 1989 when Dawson arrived at the union office, he found a telephone message from Lander saying he had tapes to "burn Hathaway." Lander was known for taping many of his conversations with other people. Dawson assumed the tapes were something Lander thought could be used in his MSPB case. Later in the morning, Murphy sent Lander to the union office with a hidden tape recorder. Dawson was helping two GSA employees with union matters when Lander arrived. Chandler was sitting approximately eighteen feet away at the other end of the office, facing away from the door. After indicating he was busy, Dawson asked Lander, in reference to the tapes, "you going to get that other data for me today?" Lander said "this afternoon." Lander then left the office with Chandler. Lander said he would come up to the union office later. That afternoon, Lander met with Chandler regarding his MSPB case.

14. On April 28, 1989, Murphy again provided Lander with a hidden tape recorder and sent him to the union office with a photo of Hathaway in a sealed envelope. The photo was on an old GSA brochure and included Hathaway and another GSA official. When Lander entered the office, he greeted Chandler, who was then called to the phone. Lander then gave Dawson the envelope with Hathaway's photo, which Dawson put aside. Chandler did not see this exchange. Following up on the Rig conversation, Lander started to tell Dawson about someone Dawson might get to rough up Hathaway. Dawson indicated his disinterest in that subject and surprise that Lander was still pursuing it. The conversation switched to Lander's MSPB case. Chandler participated in this latter discussion, which took up the majority of the meeting. Later, Dawson threw away the photo of Hathaway.

15. On May 1, 1989, Murphy interviewed Soto about the conversation at the Rig. Soto was surprised and uncomfortable to find that Murphy apparently took seriously a conversation Soto considered to be a joke. Murphy drafted a memo of the interview, which represented that Soto said he was very scared while at the Rig, but also that everyone was jovial and acting macho and Dawson was boasting and joking. Murphy was not satisfied with Soto's account and said to contact him the next day if he remembered more.

16. The next day, Soto called Murphy and then went to his office. Murphy had called in Lander, who was there when Soto arrived. While Soto was writing an affidavit, Lander stood behind him, reading what he wrote and trying to get Soto to corroborate Lander's story of what had happened at the Rig. Murphy asked questions. Soto got the impression that Murphy wanted answers that

would incriminate Dawson. As a result of Lander's prompting, Soto's affidavit described some of the same conversation that Lander had included earlier in his own affidavit, but Soto indicated he was uncertain that specific statements actually had been made. Further, Soto repeatedly stated that the conversation had been a practical joke, a prank. While Soto was present, Lander asked Murphy if he could help him with his MSPB case. Murphy said he would see what he could do.

17. On May 3, 1989, Murphy interviewed Chandler about a conversation he had with Dawson the previous evening during which Dawson had mentioned the Rig conversation but said it was a joke. Murphy asked Chandler to draft an affidavit stating only that Dawson admitted: (1) he was at the Rig with Lander and Soto, (2) there was talk of hurting someone, and (3) there was an exchange of money. Chandler refused and wrote an affidavit describing the entire conversation with Dawson as he remembered it. Murphy was angry with Chandler.

18. On May 8, 1989, Murphy complained to Chandler about the fact that the AFGE might pay attorney's fees to have Dawson represented in the Rig matter. Murphy was upset and angry.

19. On May 8, 1989, John Cartwright, then Director of the Real Estate Division, notified Dawson that he was being placed on administrative leave without loss of pay and would also be barred from the Federal Building due to the charges against him being investigated by the IG. Cartwright and his superior, Leighton Waters, Assistant Regional Administrator for Administration, were not seriously concerned about Dawson's alleged threat to Hathaway, largely because Hathaway himself had indicated he believed the threat was a joke. The decision by Cartwright, Waters, and other management personnel to ban Dawson from the building was made pursuant to a request by Murphy to Waters and as a result of management's belief that it was best to cooperate with the IG.

20. On the afternoon of May 8, Lander was in the union office on his MSPB matter. Dawson had drafted a document showing his recollection of the Rig conversation. The document stated that Lander had initially brought up the topic of Hathaway, and described the ensuing conversation as a joking venting of frustrations about Hathaway. Dawson gave Lander and Soto each a copy of the statement and asked them to look it over and make any changes they thought warranted. Soto took the document home, made a few changes, and signed it on May 25, 1989. Soto did not change the statement that Lander had initiated the topic of Hathaway. Lander only modified the document so that it no longer said he was the one who initiated the topic of Hathaway. Lander then signed the statement before a witness in the office. Before Lander did so, Dawson made it clear that he shouldn't do anything he didn't feel comfortable with. Lander was in the office for quite some time. The conversation, which was recorded unbeknownst to him, was jovial and does not indicate that Lander was pressured in any way.

21. Later the same day, Lander went to Murphy and gave an affidavit stating that Dawson had demanded he sign the statement of Dawson's recollection and that he felt coerced and threatened by the demand.

22. On May 14, 1989, Chandler drafted a memo regarding a meeting that day with Lander on the MSPB case. According to the memo, Lander told Chandler that he was the one who had reported the Rig conversation to the IG. He had done so because he was afraid Dawson might be trying to set him up in retaliation for the unfair labor practice complaint he had filed against Dawson. He was also concerned that his MSPB case would suffer if someone else reported the Rig conversation to the IG first. Lander said the Rig conversation was a joke, but he was afraid to tell the IG that now because of the effect it would have on his MSPB case.

23. On several occasions following his May 14, 1989 disclosure to Chandler, Lander sought Chandler's advice as to how to deal with the fact that although the Rig conversation was a joke, he had reported it to the IG's office as a serious threat. As Lander's representative in the MSPB case Chandler was in a difficult position. He wanted Lander to

tell the truth but was also aware of the adverse effect it might have on Lander's MSPB case. On one or more occasions, in the context of conversations that flipped back and forth between the MSPB case and the Rig matter, Chandler advised Lander he had several options in dealing with the situation, including saying he had misunderstood the Rig conversation, perhaps because of the medication he was taking. Chandler refrained from recommending any particular action because he was concerned Lander might bring an unfair labor practice complaint against him if a recommended course did not work out.

24. Lander had a reputation among his supervisors and other management personnel for lacking credibility. He also was paranoid and had a tendency to blame others for anything bad that happened to him. Murphy became aware of Lander's reputation and tendencies during the course of his investigation.

25. Shortly after Lander reported the Rig conversation to Murphy, Murphy informed Hathaway there had been a threat against him. At that time Hathaway was concerned about the threat. However, after learning that Dawson was the party alleged to have made the threat and Lander was the informant, Hathaway told Murphy he thought the threat was a joke. He also told Murphy there was no animosity between Dawson and himself. Although Hathaway and Dawson represented, respectively, management and the union, they had not directly opposed each other in negotiations or hearings for several years. Murphy did not take an affidavit from Hathaway or make memoranda of any conversations with him.[2]

26. Ignoring Hathaway's information, and in an attempt to show Dawson had a motive for threatening him, Murphy then interviewed several GSA employees regarding the relationship between Dawson and Hathaway. He worded his questions so as to elicit information showing that the two men had an adversarial relationship based on their official duties, but also that they personally disliked each other. Murphy took affidavits from two employees and recorded memoranda of his interviews with two others to this effect.

27. On July 24, 1989, Dawson's attorney, Michael Heiskell, sent AUSA Worley a letter with several accompanying documents. One was an affidavit by a GSA employee stating Lander had informed her the Rig conversation was a joke; he had also referred to Dawson's having caused his fourteen-day suspension. Another was a copy of Chandler's May 14, 1989 memo of Lander's disclosure regarding the Rig conversation. The third document was a memo of an interview Heiskell had with the woman who witnessed Lander's signature of May 8, 1989 on the statement of Dawson's recollection of the Rig conversation. The woman stated that at the time Lander signed the document he was laughing and joking and did not appear to be under duress. Worley showed Murphy these documents.

28. A grand jury hearing was scheduled for August 1989 regarding the alleged conspiracy to harm Hathaway. On August 15, 1989, Lander called Murphy and told him that on August 12, Chandler had come to his apartment and said "they" wanted Lander to tell the grand jury he misunderstood the Rig conversation because he was on drugs and the conversation was just a joke. Lander said he felt Dawson and his attorney were trying to use Chandler's friendship with Lander to persuade Lander to lie to the grand jury. In fact, on August 12, 1989 Chandler

---

2. Although there was conflicting testimony regarding whether Hathaway told Murphy he thought the alleged threat against him was a joke, the Court finds the evidence supporting that fact more credible and greater in weight. Several of Hathaway's associates stated that he told them he believed the threat was a joke. Even more significant, while Murphy kept notes or affidavits reflecting his conversations with each witness who supported his theory of plaintiffs' guilt, he kept no notes from any of his conversa-tions with Hathaway and was unable to give an explanation for this lapse. An experienced investigator, Murphy surely questioned Hathaway on his relationship with Dawson and the latter's possible motives for wishing to harm him. Indeed, Hathaway testified that Murphy did question him in this regard. Had Hathaway taken the threat seriously and provided information suggesting a motive for Dawson's alleged threat, Murphy would have kept a record of the fact.

attended an out-of-town family reunion from which he did not return until late afternoon on August 13, 1989. Lander lied to Murphy about the August 12 conversation in order to bolster his own story and further incriminate Dawson.

29. Also on August 15, 1989, Lander told Murphy that a friend of his, James Phillips, said Chandler had talked to him about Lander changing his testimony. On August 16, at Murphy's request, Phillips gave an affidavit regarding a conversation he had with Chandler on August 3, 1989. The affidavit stated that: Chandler was concerned because Lander had told the IG one story but was telling a different story when he was out socializing; Chandler wished Lander would tell the IG he had not realized the Rig conversation was a joke because of the medication he was taking; Chandler said if Lander had to testify at the grand jury hearing, he should make the same statement or invoke his Fifth Amendment rights; although Chandler did not ask Phillips to tell Lander the foregoing, Phillips believed Chandler expected Phillips to do so because of the friendship between Phillips and Lander. Murphy did not attempt to clarify or corroborate Phillips' and Landers' information.

30. Prior to the August 1989 grand jury hearing, AUSA Worley performed no independent investigation of the Rig conversation except to speak with Lander on one occasion. Murphy provided Worley with copies of the tapes and transcripts of the April 25, 26 and 28, 1989 conversations between Lander and Dawson, as well as some of his memoranda of interviews and the affidavits or statements made by various individuals. Murphy did not tell Worley he was the one who asked GSA management to ban Dawson from the Federal Building. Nor did he inform Worley that Hathaway said there was no animosity between Dawson and himself and believed the alleged threat was a joke. Worley conducted only a cursory review, if any, of the information Murphy provided and relied almost entirely on Murphy's account of the evidence.

31. On August 23, 1989, Murphy, Lander, Soto, Dawson, and Chandler appeared before the grand jury convened by AUSA Worley to investigate Lander's allegations regarding the Rig conversation. Prior to the hearing, Murphy provided Worley with suggested questions to ask the respective witnesses. Worley asked virtually all of the requested questions.

32. Murphy was already familiar with Dawson and Chandler for reasons totally apart from their connection with the Rig incident. In 1984, Dawson, as Vice President of the AFGE, filed an unfair labor practice charge against GSA, claiming that Murphy had violated Chandler's union rights. The charge, as well as Chandler's letter describing Murphy's alleged improper conduct, was sent to Murphy directly, as well as to GSA and IG officials. The Federal Labor Relations Authority subsequently issued a complaint against GSA, the text of which expressly named Murphy. As a result of their complaint against him and the antagonism on which it was based, Murphy was not well-disposed toward Dawson and Chandler.[3] Through other contacts, he also felt that Dawson was overbearing and misused his authority as a union official.

33. During the August grand jury hearing, Murphy testified regarding the Rig conversation and the motives of Dawson, in particular. Murphy gave false testimony, mischaracterized facts, and presented his own views and assumptions as fact. He volunteered information irrelevant to the investigation at hand that placed Dawson in a negative light but withheld exculpatory evidence even when it was directly called for. Far from presenting evidence fairly as a neutral investigator, Murphy evinced a personal dislike for Dawson and an intent to strengthen the case for possible charges against him. Without describing each and every falsehood, inaccuracy or omission, the Court finds the following to be significant and representative.

(a) Murphy testified that he had attempted to interview Dawson on several occasions but each time Dawson refused. In reality,

3. Although during the trial of this matter Murphy denied receiving or even knowing of the charge and complaint naming him, the Court concludes

from Murphy's demeanor that he did know of the charge and was angry at Dawson and Chandler for naming him as the offender.

on the only occasion Murphy attempted to interview Dawson, Dawson asserted his right to have an attorney present, after which Murphy terminated the interview. Subsequently, Dawson and his attorney voluntarily presented themselves to Murphy for an interview, which Murphy declined. Murphy did not again attempt to interview Dawson.

(b) Murphy intentionally misrepresented a number of details in describing the taped conversations between Lander and Dawson regarding the photo of Hathaway. The errors increased the ·impression that Dawson was anxious to obtain the photo and concerned that its exchange be carried out in a clandestine manner. Murphy did not reveal that when Lander attempted to propose a "hit man," Dawson showed no interest. The tapes were not played for the grand jury.

(c) Murphy testified that the relationship between Dawson and Hathaway was one of personal hatred, built up through years of direct conflict. Murphy did not reveal that the two men had had little contact in recent years or that Hathaway himself had denied there was any animosity between Dawson and himself.

(d) Murphy testified that the GSA barred Dawson from the Federal Building and put him on administrative leave because of the agency's belief that the allegations regarding the Rig conversation had merit and were a very serious matter. Murphy did not reveal that *he* had requested GSA to take these actions against Dawson or that Hathaway thought the threat was a joke.

(e) Murphy, without any questioning on the subject, brought up the fact that Dawson was paid by the GSA even though he spent all his time on union work. The grand jurors took note of this irrelevant information and one remarked that this appeared to be a conflict. Murphy then bolstered the implication that Dawson was unscrupulous and was getting away with something improper by stating that the IG considered Dawson's position to be very unusual and was investigating it.

(f) When asked about the documents submitted by Dawson's attorney—the affidavit and memos showing Lander knew the Rig conversation was a joke, his reasons for reporting it to the IG, and the questionable nature of his claim that Dawson coerced him into signing a statement—Murphy dismissed the documents as simply attacking Lander's credibility. He did not provide the authors or substance of the documents so that the grand jury could make the determination of whether they were worthy of consideration or question Lander about their contents. Murphy then stated that Chandler had attempted to get Lander to lie to the grand jury and say the Rig conversation was a joke, without mentioning Chandler's memo, which showed Chandler had grounds to believe the conversation was in fact a joke.

(g) Murphy consistently described Lander as a law enforcement officer in order to bolster his credibility and put the IG's investigation in a better light, although Lander had been discharged prior to reporting the Rig conversation.

(h) Murphy testified several times that Soto and Dawson were personal friends and that Soto felt indebted to Dawson for having represented him in a successful challenge of his discharge. The grand jurors considered this information important and sought Murphy's corroboration of it later in his testimony. Murphy had no factual basis for these statements, but nevertheless used them to explain why Dawson would have sought Soto's involvement in a conspiracy to harm Hathaway and why Soto would attempt to protect Dawson.

34. Lander knew that the only way to maintain his credibility and not jeopardize his chance of regaining his job was to testify consistently with his earlier reports to the IG. Lander's testimony at the August 23, 1989 grand jury hearing therefore repeated his previous allegations against Dawson and Chandler. Nonetheless, his testimony was inconsistent, false, or misleading in a number of respects that reflected badly on Dawson and Chandler.

35. AUSA Worley believed that Murphy and Lander gave true and fair testimony during the August 1989 grand jury hearing.

36. At the time of the August 1989 grand jury hearing, neither Dawson nor Chandler

was aware that the April 1989 conversations between Lander and Dawson in the union office had been recorded.

37. AUSA Worley did not present the August 23, 1989 grand jury with a proposed indictment. Neither he nor Murphy believed there was sufficient evidence to prove a conspiracy against Hathaway. Nevertheless, on August 24, 1989 or soon thereafter, Worley agreed that Murphy should review the August 23, 1989 grand jury testimony for evidence of possible perjury by Dawson and Chandler.

38. On August 29, 1989, Chandler sent Murphy a letter explaining his difficult position as Lander's representative in the MSPB case. He indicated that Lander had divulged information to him which he was unable to reveal while he represented Lander. He also stated that, in response to questions by Lander, he had given advice as to options, but could not tell him which action to actually take.

39. Murphy prepared a list of statements in Dawson's and Chandler's grand jury testimony that he contended conflicted with other evidence. The statements were taken out of context in a number of instances, and Murphy omitted follow-up statements that modified the statements listed. In addition, Murphy listed Dawson and Chandler as having denied certain facts when, in fact, they had never been asked directly about those facts and did not deny them, but were responding to vague questions in a generalized fashion. Murphy drafted language for an indictment based on some of the listed testimony. He did not interview Dawson or Chandler concerning their statements to the August 23, 1989 grand jury or the facts underlying the proposed charges against them. The only new investigation he did was to review some of the documents submitted by Chandler in Lander's MSPB case, as well as the MSPB Judge's final opinion.

40. On November 21, 1989, Murphy spoke with Chandler and told him the United States Attorney's office was considering bringing charges against him for perjury and obstruction of justice. Murphy said that if Chandler testified against Dawson, the government might not proceed against Chandler. Chandler said he did not want to testify against Dawson. Following this conversation, Murphy did not speak with Chandler again and made no attempt to corroborate the charges against him.

41. On April 10, 1990, the same grand jury that had met on August 23, 1989 was reconvened to consider an indictment against Dawson and Chandler for perjury and against Chandler for obstruction of justice. Dawson and Chandler were not informed that the grand jury was being reconvened. AUSA Worley relied on Murphy's information in drafting the final indictment and presenting evidence to the grand jury. Worley himself did no investigation and spent less than half a day, perhaps as little as an hour, reviewing the material Murphy provided to him.

42. The perjury charges, five counts against each man, were based directly on sections of Dawson's and Chandler's grand jury testimony that Murphy had earlier listed as being false, with the same omissions of follow-up, modifying testimony. Two of the counts against Dawson were based on his statements that Lander initiated the topic of Hathaway; three were based on the fact that he had requested from Lander a photo of Hathaway. One of the perjury counts against Chandler was based on his statement that there was no discussion of "other data" when he met with Lander on April 26, 1989; three were based on his denial that he had told Lander or anyone else that Lander should say the Rig conversation was a joke and that he had been on medication; one was based on his opinion of Lander's credibility, in which he referred to Lander's bad reputation for credibility among his supervisors and said he believed medication had affected Lander's perception. The count of obstruction of justice was based on Chandler's allegedly having attempted on August 12, 1989 to get Lander to change his truthful testimony regarding the Rig conversation. A copy of the indictment is attached to this opinion.

43. AUSA Worley questioned only one witness, Murphy, at the April 1990 grand jury hearing. Worley relied on Murphy to present the relevant facts to the grand jury.

Murphy described the grand jury testimony from the August 1989 hearing and explained the basis on which he contended Dawson and Chandler had perjured themselves. Murphy falsified or misrepresented important facts and took things out of context in order to incriminate Dawson and Chandler. He omitted information that undermined his assertion that the men were guilty on all charges. Following are some of the more significant examples.

(a) Murphy stated that both Lander and Soto had testified that Dawson initiated the topic of Hathaway. When a grand juror expressed some doubt on this issue, Murphy testified that in response to a leading question from a juror as to whether Dawson had initiated the topic, Soto had said "yes." In fact, Murphy knew Soto had never stated that Dawson initiated the topic of Hathaway. Murphy did not tell the grand jury that the only time Soto directly addressed the issue, in the document he signed on May 25, 1989, he stated that Lander initiated the topic of Hathaway.

(b) Murphy testified that certain statements of Dawson were false because Dawson had requested Lander to provide him with a photo of Hathaway. In fact, Dawson was never directly asked whether he requested a

photo from Lander and never denied that he did so. Dawson testified that he told Lander a photo would be needed; his affidavit presented at the first grand jury hearing included a similar statement. Lander's original affidavit contained virtually the same statement.

(c) Murphy misrepresented the recorded conversations between Dawson and Lander by adding details showing Dawson wanted to obtain the photo of Hathaway in a clandestine manner. Two of the misrepresentations were so obvious that Worley noticed and questioned Murphy about them, after which Murphy corrected himself.[4]

(d) Murphy testified that Dawson lied when he stated that Lander came to the office on April 28, 1989 to meet with Chandler on Lander's MSPB case. According to Murphy, Dawson knew the only purpose of the meeting was for Lander to give Hathaway's photo to Dawson. Murphy did not explain that: (1) Lander had been going to the union office on a regular basis to meet with Chandler on the MSPB case; (2) only he, Murphy, knew when he was going to send Lander to deliver the photo; (3) the last time Dawson and Lander had talked, on April 26, 1989, Lander had said he was going to bring

---

**4.** Worley's questions and Murphy's testimony occurred as follows:

Q: But did [Lander] just show up or was he supposed to have been there?
A: . He was supposed to have been there. According to the prior tapes, Mr. Dawson had requested Mr. Lander to get him a photograph, to put in in a—I believe it was either a white or brown Manila envelope, unmarked, and if possible to meet him outside of the federal building where there would be no witnesses.
Q: Did he say where there would be no witnesses or did he just say, "meet me outside the federal building?"
A: He asked him to meet him outside the federal building.
April 10, 1990 Transcript at 17.
A: Mr. Lander went to the office for the express purpose of giving Mr. Dawson the picture. However, according to the tape, when Mr. Dawson opened the door he told Tim, he said—Literally he said, "Tim, there are two wit." He didn't say witnesses, he said, "There are two wit here." He said he wanted to make sure that Tim knew that Derrell—
Q: No, you're assuming. He said what?
A: What he said was, "Tim, there are two wit here."

April 10, 1990 Transcript at 19–20. These exchanges indicate that when Worley was aware Murphy was misrepresenting the facts to the grand jury, he had Murphy correct himself. Murphy's immediate correction shows he knew the correct facts, but chose to change or embellish them. In most cases, however, because Worley was not fully familiar with the evidence, Murphy's misrepresentations went uncorrected. For example, the tapes show that Dawson did not ask Lander to put the photo of Hathaway in an unmarked white or brown manila envelope, but simply said if Lander and he were unable to meet in person, Lander should put the photo in "an envelope." Further, Dawson did not ask Lander to meet him outside the building, but only agreed to Lander's request that he do so.
 The Court also notes that Murphy's interpretation of the April 26, 1989 tape to have Dawson saying "There are two wit here," which Murphy explained as meaning Dawson was warning Lander that there were two witnesses in the office, was pure wishful thinking. The tape clearly shows that Dawson, who was working with two GSA employees when Lander walked in, stated "Tim. Wait a minute."

the "other data," which Murphy interpreted as the photo, that afternoon; (4) Lander and Dawson did not agree to meet on April 28; and therefore that Dawson had no reason to know that Lander's visit to the union office on April 28 was specifically to deliver the photo. Murphy erroneously denied that a significant part of the April 28 meeting was spent discussing Lander's MSPB case. Murphy also did not tell the grand jury that Dawson had never heard the tape of the April 28 meeting, which had taken place some four months before Dawson gave his testimony. This fact would have put in perspective Dawson's failure to remember the exact order of the visit.

(e) Murphy told the grand jury that Hathaway felt his relationship with Dawson had turned into something personal that could be physical, when in fact Hathaway had told Murphy he believed the alleged threat was a joke and there was no personal animosity between Dawson and himself. Murphy's statement in this regard had no basis whatsoever. None of the other GSA employees whom Murphy interviewed regarding the relationship between Dawson and Hathaway had suggested that the relationship had an incipient violent aspect.

(f) Murphy testified several times that Chandler was in the union office when Lander delivered the photo to Dawson, thereby giving the grand jury the impression that Chandler was aware of and involved in the alleged conspiracy to harm Hathaway. Murphy did not inform the grand jury that Lander stated Chandler did not observe the exchange.

(g) Murphy testified that Chandler lied by saying there was no discussion of "other data" when he met with Lander on April 26, 1989. Murphy did not reveal to the grand jury that Lander told him Dawson took him aside when he asked for the "other data," thus making it unlikely Chandler would have heard that statement.[5] He also did not reveal that, in testimony not quoted in the indictment, Chandler said he simply did not "remember" such a statement, and that

Chandler's testimony other than that actually quoted in the indictment showed he was talking about an entirely different conversation than the one recorded by Murphy.

(h) Murphy testified that Chandler attempted to alter and influence Lander's grand jury testimony by suggesting he change his story and say the Rig conversation was a joke. Murphy did not tell the grand jury that as early as May 14, 1989, Chandler had written a memo stating Lander told him the conversation was a joke and wished he had never reported it to the IG. Murphy also did not tell the grand jury that a GSA employee totally uninvolved in the Rig incident wrote an affidavit stating that Lander told her the Rig conversation was a joke. Thus, Murphy prevented the grand jury from knowing Chandler had a legitimate basis for advising Lander he might say the conversation was a joke.

(i) Three perjury charges were based on Chandler having denied he told Lander or anyone else that Lander should say the Rig conversation was a joke and he was on medication. The indictment quoted only the simple denial, not Chandler's follow-up testimony. Murphy did not inform the grand jury that Chandler testified he had advised Lander of the option of saying the Rig was a joke and that he was on medication. Nor did Murphy tell the grand jury that Phillips stated Chandler never actually asked or told him to speak to Lander about changing his testimony.

(j) Despite Chandler's August 29, 1989 letter explaining his awkward position as Lander's representative in the MSPB case, Murphy referred to Chandler's statements on behalf of Lander in that entirely unrelated case to discredit Chandler's grand jury testimony regarding Lander's credibility. Murphy told the grand jury that the MSPB judge had found Lander credible, but did not tell them her decision was based solely on the written MSPB record. Murphy also misrepresented the findings of the MSPB judge, erroneously claiming she found that Lander's supervisors had retaliated against him and

---

**5.** At plaintiffs' criminal trial, Lander himself testified that he did not believe Chandler had heard this exchange.

were lacking in credibility. In reality, the judge concluded that retaliation was not proven and that Lander's supervisors who were the deciding officials regarding his discharge had testified without contradiction and made their decision based on permissible factors. Murphy's misrepresentation was intended to support Lander's credibility, to show Murphy was reasonable in relying on him and to bolster the perjury charge based on Chandler's opinion of Lander's credibility.

44. Worley believed that Murphy gave true and fair testimony during the April 1990 grand jury hearing.

45. The grand jury had heard the testimony of Dawson, Chandler, and the other witnesses almost eight months earlier and accordingly relied primarily if not entirely on Murphy's testimony in considering the proposed charges. On April 11, 1990, the grand jury returned the indictment against Dawson and Chandler for perjury and obstruction of justice.

46. In October 1990, Dawson and Chandler were tried on the charges for which they were indicted. During the trial, the judge on more than one occasion indicated to the prosecutor (out of the hearing of the jury) his belief that there was no merit to the charges and that they never should have been brought. After a trial that lasted over a week, the jury deliberated less than an hour, then acquitted both men on all counts.

47. Lander, who reportedly lives in Mexico now, did not testify at the trial of this matter. Although he was in Fort Worth within the month preceding the trial, speaking with persons at GSA, the government did not subpoena him or call him as a witness. The government relied on his affidavits, grand jury testimony, and testimony at plaintiffs' criminal trial.

48. Soto, who now reportedly lives in Colorado, also did not testify in the trial in this matter. The government relied on his affidavit, grand jury testimony, and testimony at plaintiffs' criminal trial.

### CONCLUSIONS OF LAW

Before considering the plaintiffs' substantive claim of malicious prosecution, the Court addresses several motions that were carried along at the conclusion of the trial.

1. *Plaintiffs' motion to take judicial notice of file*

Plaintiffs Dawson and Chandler moved for production and judicial notice of a file from the U.S. Attorney's Office in Houston, Texas regarding the prosecution of Patrick O. Houston. Plaintiffs argued the file would show that in Houston's case, also investigated by Murphy, perjury charges were brought, as in their case, instead of an indictment on the original matter of investigation. Houston's case was dismissed before trial, plaintiffs contended, because after interviewing some of the witnesses, the prosecutor discovered that Murphy had mislead him.

Having reviewed the Houston file *in camera*, the Court finds there is no material in the file that is relevant or admissible in this case. Accordingly, plaintiffs' motion seeking judicial notice of the file is DENIED.

2. *Plaintiffs' motion to admit prior deposition testimony of Alfred Soto*

Plaintiffs moved to admit testimony of Alfred Soto given in two depositions plaintiffs took in April and May 1991. Plaintiffs took the depositions in support of proceedings before the MSPB in which, after being acquitted, they sought wages and/or benefits lost as a result of their indictment and their time away from work. The government opposed admission of the testimony under Fed. R.Evid. 804(b)(1), arguing that at the time the depositions were taken the only issue before the MSPB was whether it had jurisdiction; therefore, although the government had a representative at the depositions, it had no motive to develop the testimony by cross-examination. The government contended there was no other basis for admission of the depositions.

Although plaintiffs questioned Soto on some of the very issues involved in this litigation, the Court concludes that the circumstances of his deposition were such that GSA did not have an adequate motive to develop his testimony. GSA did not send an attorney to the depositions and had no reason to be-

lieve the testimony would be used for purposes of creating the kind of liability at issue here. The Court therefore will not admit the deposition under Fed.R.Evid. 804(b)(1). Further, although Soto's deposition testimony is consistent with his other prior testimony and therefore appears to be generally trustworthy, it is not necessary to the Court's conclusions. The Court therefore finds the deposition inadmissible under Fed. R.Evid. 804(b)(5). Finding no other basis for admitting the deposition, the Court DENIES plaintiffs' motion to admit Soto's deposition testimony.

### 3. *Government's motion to reconsider Lander's status as a law enforcement officer*

In a motion for partial summary judgment, the government moved to dismiss plaintiffs' claims to the extent they were based on the actions of Lander. The government argued that Lander had been discharged before the events in this lawsuit and therefore was not acting within the scope of his employment, let alone as a federal law enforcement officer, at the time; under 28 U.S.C. § 2680(h), then, a claim of malicious prosecution could not be based on his actions.[6]

On September 9, 1993 the Court denied dismissal of the claims against Lander. The Court found that, contrary to its present contention, the government had previously certified in a related action before another judge that Lander was acting within the scope of his employment at the time of the events in question. As a result of the certification, Lander had been dismissed as an individual defendant in that action, leaving plaintiffs with far more limited remedies against the government under the FTCA. In addition, through Murphy, the government had represented to the grand jury that Lander was a law enforcement officer at the relevant times in order to add credibility to Lander's information and the government's reliance upon it. Based on these facts, the Court determined that the government was

now estopped from denying Lander was a law enforcement officer acting within the scope of his employment during the events in this case.

The government has moved for reconsideration of the September 9, 1993 Order to the extent it denies dismissal of the claims against Lander. Unwilling as the Court is in view of the government's inexcusable conduct and its detrimental effect on plaintiffs, the Court concludes it must grant the motion.

As sovereign, the United States is immune from suit except as it consents, and the terms of its consent to be sued in a particular court define that court's jurisdiction to hear a suit against the government. *See, e.g., Lehman v. Nakshian*, 453 U.S. 156, 160, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981). Applying this principle, it has been held that federal courts lack subject matter jurisdiction to hear claims against the United States falling within one of the exceptions to the FTCA. *City of Garland v. Zurn Industries, Inc.*, 870 F.2d 320, 326 (5th Cir.1989). Thus, the Court lacks subject matter jurisdiction over plaintiffs' claims for malicious prosecution against Lander unless at the time of his relevant conduct Lander was a law enforcement officer within the terms of section 2680(h). The Court previously found the government was estopped from denying Lander was a law enforcement officer. However, lack of subject matter jurisdiction may not be created or waived by the parties' consent, conduct or even by estoppel. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982); *Sarmiento v. Texas Bd. of Veterinary Medical Examiners*, 939 F.2d 1242, 1245 (5th Cir. 1991). Hence, unless the evidence shows Lander actually was a law enforcement officer at the critical times, dismissal of plaintiffs' claims based on his conduct is required.

Plaintiffs contend that Lander was a law enforcement officer at the relevant times.

---

**6.** Section 2680(h) provides that malicious prosecution claims are not covered by the FTCA except when based on the acts or omissions of investigative or law enforcement officers of the United States. An "investigative or law enforcement officer" is one "empowered by law to exe-

cute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). For purposes of brevity, this Order refers to such officers simply as "law enforcement officers."

Citing *Kerr v. National Endowment for the Arts,* 726 F.2d 730 (Fed.Cir.1984), they argue that although he was discharged and turned in his law enforcement credentials prior to the Rig conversation and ensuing events, the MSPB's cancellation of his discharge one year later had the effect of returning him to his former position as of the date he was discharged. While *Kerr* held that the purpose of an MSPB cancellation order is to place the employee as nearly as possible in the *status quo ante,* it does not mandate the conclusion plaintiffs assert. *Kerr* simply held that upon reinstatement, the discharged employee must be given duties and responsibilities substantially equivalent to those held before the discharge. It did not purport to hold that a person in Lander's position is to be retroactively placed in his former position such that his employer may be held liable for his actions during the time he was discharged. Based on the facts before it, the Court cannot find that Lander was a law enforcement officer during the events on which plaintiffs base their claim.

The evidence clearly supports plaintiffs' claim of malicious prosecution against Lander. Nevertheless, for the foregoing reasons, the Court must GRANT the government's motion for reconsideration and now DISMISSES plaintiffs' claim of malicious prosecution to the extent it is based on the conduct of Warren T. Lander.

### 4. *Malicious prosecution claim*

#### A. *Federal Tort Claims Act requirements and limitations*

As a result of the Court's earlier rulings, plaintiffs' only remaining claim at trial was for malicious prosecution under the FTCA. As indicated earlier, the government's consent to be sued under the FTCA is limited by various exceptions, one of which is that a claim of malicious prosecution is only cognizable if based on the acts or omissions of a law enforcement officer. It is undisputed that Murphy was a law enforcement officer within the terms of 28 U.S.C. § 2680(h) at all times relevant to this lawsuit.

A second exception to the FTCA is also relevant here. Section 2680(a) provides that the FTCA does not apply to:

Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Applicability of the discretionary function exception depends on the nature of the conduct involved, particularly whether Congress intended that sort of conduct to be shielded from liability. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). The exception was intended to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy" and to protect the government from liability that would seriously handicap efficient operations. *Id.* at 814, 104 S.Ct. at 2765.

It is generally agreed that decisions by U.S. Attorneys regarding when, where, how, and who to investigate, and whether to prosecute, are the kind of conduct protected from suit by the discretionary function exception. *See, e.g., Sutton v. United States,* 819 F.2d 1289, 1293 (5th Cir.1987); *Gray v. Bell,* 712 F.2d 490, 514 (D.C.Cir.1983). Whether investigative decisions by agents such as Murphy also fall within the exception is less clear, the outcome depending on the exact nature of the conduct involved. *Compare Sutton,* 819 F.2d at 1294 (stating in dicta that investigative agent's suppression of favorable evidence and manipulation of other evidence may well fall outside discretionary function exception); *Wright v. United States,* 719 F.2d 1032, 1035 (9th Cir.1983) (unlike decision to prosecute, investigative officer's conduct before and after decision is not exempt from review); *Crow v. United States,* 634 F.Supp. 1085, 1089 (D.Kan.1986) (while agent's planning, preparation and completion of investigation comprises discretionary conduct, falsification of memoranda and giving of false testimony is not). Nevertheless, without exception, courts have held that an investigative agent's giving of false testimony to a

grand jury is not immune as a discretionary function. *See Wright, supra; Crow, supra; Heywood v. United States*, 585 F.Supp. 590, 591–92 (D.Mass.1984).

■■■ The discretionary function exception bars plaintiffs from basing their malicious prosecution claim on AUSA Worley's conduct in relation to plaintiffs' prosecution. The government argues that the exception also prevents a claim based on the manner in which Murphy investigated the charges against plaintiff. Although Murphy's investigation was both biased and deplorably deficient, reflecting an intent to incriminate regardless of the evidence, the Court determines that the investigation itself did not involve non-discretionary conduct. Therefore, the manner and scope of Murphy's investigation may not serve as a basis for the malicious prosecution claim.[7] However, Murphy's participation in bringing charges against plaintiffs without probable cause, particularly his giving of false testimony and withholding of material information from the prosecutor and the grand jury, fall outside the discretionary function exception and are subject to the Court's review.

### B. *Elements of malicious prosecution and the evidence*

Under the FTCA, plaintiffs must prove that Murphy's wrongful conduct occurred "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The parties are agreed that Texas law applies in this case.

■■■ To recover for malicious prosecution under Texas law, a plaintiff must prove:

1) the commencement of a criminal prosecution against the plaintiff; 2) which has been caused by the defendant or through the defendant's aid or cooperation; 3) which terminated in the plaintiff's favor; 4) that the plaintiff was innocent; 5) that there was no probable cause for the pro-

ceedings; 6) that it was done with malice; and 7) that it damaged the plaintiff.

*Browning–Ferris Indus., Inc. v. Lieck*, 845 S.W.2d 926, 936 (Tex.App.—Corpus Christi 1992). *See also Pete v. Metcalfe*, 8 F.3d 214, 219 (5th Cir.1993); *Brown v. United States*, 653 F.2d 196, 198–99 (5th Cir.1981), *cert. denied*, 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982). Although the Texas Supreme Court does not appear to have ruled on the issue, one appellate court has held that the elements must be proven by clear and convincing evidence. *Lieck*, 845 S.W.2d at 935; *Diamond Shamrock Corp. v. Ortiz*, 753 S.W.2d 238, 241 (Tex.App.—Corpus Christi 1988). The Court finds it best to apply this standard.

[12] There is no question that the first and third elements have been met in this case. In addition, the evidence showed that plaintiffs were damaged by their wrongful prosecution, both in monetary and emotional terms. For the following reasons, the Court concludes that the other elements are satisfied as well.

#### 1. *Causation*

■■■ Citing *Lieck, supra*, and *Thomas v. Cisneros*, 596 S.W.2d 313 (Tex.Civ.App.—Austin 1980), the government argues that the element of causation is not satisfied because Murphy fully and fairly disclosed all relevant facts to AUSA Worley, thereby breaking the chain of causation. This argument fails for two reasons. First, Murphy did not fully disclose all relevant information to Worley. For example, he did not inform Worley that Hathaway said there was no animosity between Dawson and himself and believed the alleged threat by Dawson was a joke. Further, Murphy's analysis of Dawson and Chandler's testimony in the first grand jury hearing, which he presented to Worley and on which Worley directly relied in drafting the indictment, quoted testimony out of context and omitted follow-up testimony undermining the perjury charges.

---

**7.** While not directly actionable, the deficiencies in Murphy's investigation add to the impression that his pursuit of plaintiffs was done maliciously and without probable cause. Nonetheless, be- cause there is ample evidence of these elements without considering the nature of Murphy's investigation, the Court does not base its findings on the investigation.

In addition, in the cases cited by the government, the defendant's testimony to a grand jury was not at issue and the prosecutor chose to press charges based directly on the defendant's information given to the prosecutor. Here, by contrast, the decision to prosecute was made through the medium of the grand jury, which had to determine whether there was probable cause to indict. Worley relied on Murphy to gather, analyze, and present the evidence fully and fairly to the grand jury. Worley barely reviewed the evidence and essentially followed Murphy's recommendations. Murphy even provided Worley with the questions to be asked each witness at the first hearing. Murphy's testimony at the first grand jury hearing presented an overview of the case and painted a picture of Dawson as an unscrupulous wielder of power who could and would manipulate anyone who had ever benefitted from union representation. As the only witness at the second hearing, Murphy was responsible for shaping the grand jury's view of the evidence, which he filtered and altered to make the case against Dawson and Chandler. The Court therefore finds that, regardless of the information Murphy provided to Worley, Murphy's false and misleading testimony to the grand jury caused it to return the indictment and thus initiate the prosecution of plaintiffs.

### 2. Innocence

▮ The Court concludes that plaintiffs have proven their innocence of the charges for which they were prosecuted by clear and convincing evidence. First, the Court is convinced that Dawson did not commit perjury by testifying that Lander initially brought up the subject of Hathaway during the Rig dinner. Lander had just had an argument with Hathaway that afternoon and had been deposed with regard to his discharge, which he attributed at least in part to Hathaway, the personnel director. Dawson, on the other hand, had not had any contact with Hathaway for some time and there was no evidence of any reason why he suddenly would have been angry at Hathaway. In addition, the evidence showed Lander was volatile and paranoid, often using crude language to blame all his problems on others. Thus, while Dawson admitted he was the one who

initiated the joke of exchanging and then returning twenty dollars, and all three men admitted to speaking about Hathaway getting hurt, the Court finds it far more likely that Lander first complained of Hathaway. This finding relates to Dawson's innocence of two of the charges against him.

Next, the Court finds that Dawson never denied he requested a photo of Hathaway from Lander and therefore could not be guilty of the three perjury charges based on that request. The Court also finds that Dawson did not perjure himself when he testified that he did not take the Rig conversation seriously and indicated, in general terms, that he was surprised when Lander appeared to be serious about wanting to deliver a photo of Hathaway. The evidence showed that Dawson made no effort to follow up on the Rig conversation until approached by Lander. Then, being extremely busy, he simply went along with Lander's proposals to deliver the photo. Dawson knew Lander to be a difficult person and felt it best to humor him. When the photo of Hathaway was finally delivered, Dawson threw it away. He showed no interest when Lander tried to suggest a "hit man" to take care of Hathaway. Based on these facts, and the fact that Dawson had no reason to know Lander's visit to the union office on April 28, 1989 was solely for the purpose of delivering the photo, the Court also concludes that Dawson did not commit perjury when, four months after an occasion he did not consider significant, his description of the April 28 visit was not accurate in its details.

With respect to the charges against Chandler, the Court finds that Chandler did not commit perjury when he stated that Dawson did not ask Lander about "other data" on April 26, 1989. Chandler had no reason to hear or focus on Dawson's use of that term and, in his testimony, was clearly referring to a meeting he had with Lander at a different time than that referred to in the question AUSA Worley asked him.

The Court further finds that Chandler was innocent of the three counts of perjury based on his alleged attempt to get Lander to change his testimony. While Chandler

wished Lander would be truthful, and advised him of various options in light of his earlier untruthful report to the IG's office, Chandler carefully refrained from saying that Lander *should* take any particular path. Chandler's discussions with persons other than Lander himself expressed Chandler's frustration with Lander's inconsistent positions and concern that they would jeopardize the MSPB case; Chandler continually was fearful that an unfavorable outcome in that case would lead to Lander's filing an unfair labor practice complaint against him. To the extent Chandler suggested to Lander or others that Lander might say the Rig was a joke, he was only suggesting Lander tell the truth as Chandler understood it. For these same reasons, Chandler was innocent of the count of obstruction of justice.

Finally, the Court finds that Chandler was innocent of the charge of perjury based on his opinion of Lander's credibility. The facts stated in the opinion have all been shown to be correct. Further, taking into consideration that Chandler knew Lander had lied to the IG's office, was paranoid and was blaming everyone else for his employment problems, the Court finds that Chandler was honest in stating he believed Lander's perception was messed up.

### 3. *Probable cause*

▮▮▮▮ The Texas Supreme Court has defined probable cause, in the context of a malicious prosecution case, as "the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the [defendant] that the person charged was guilty of the crime for which he was prosecuted." *Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex.1983),

*cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). The standard is an objective one, based on the view of a reasonable person. While subsequent events may not be considered, the trier of fact may consider all evidence that the defendant knew or should have known at the time he instituted or cooperated in the prosecution. *Id.* at 920–21.

The Court finds, based on all the evidence, that a reasonable person considering the facts within Murphy's knowledge at the time he testified at the second grand jury hearing would not have believed plaintiffs guilty of the crimes with which they were charged. Murphy had information that negated each count in the indictment. His inculpatory information derived almost entirely from Lander, a man widely reputed to be lacking in credibility and whose testimony in the first grand jury hearing was erroneous in a number of respects evincing a desire to inculpate Dawson. On the other hand, substantial evidence showed that: the Rig conversation was a joke, on which no follow-up action was taken except that instigated by Murphy and Lander; Dawson and Chandler did not know recordings were made of Lander's visits to the union office on April 25, 26 and 28, 1989, and therefore had no reason to remember the order or details of the conversations that took place at those times; Lander admitted the Rig conversation was not serious in informal contexts but had strong reasons not to retract his report to the IG's office; and Chandler understood this and was in the awkward position of having to advocate Lander's cause to the MSPB.[8] Moreover, Murphy knew that several of the charges for

---

**8.** During trial, the government moved to admit the deposition of Tamara Thissen, a woman who had an on-and-off affair with Lander before or about the time of the events in this lawsuit. The government asserted that the deposition was relevant because in it Thissen stated that Chandler had spoken to her on more than one occasion about Lander changing his story and saying the Rig conversation was a joke. According to the government, these statements supported its position that Murphy had probable cause to pursue perjury and obstruction of justice charges against Chandler.

Having reviewed all the evidence regarding Thissen, the Court concludes that Murphy was

not aware at the time of the grand jury hearings of Thissen's statements regarding Chandler and therefore could not have relied on them in determining there was probable cause for the charges against Chandler. Moreover, Thissen's statements do not support those charges. Thissen stated that Chandler believed the Rig conversation was a joke and that Lander had made up the information he provided to the IG, and that Chandler wished someone could talk to Lander about it. Thus, had Thissen spoken to Murphy on this subject, he would simply have had additional evidence that Chandler wanted Lander to tell the truth as Chandler understood it.

perjury were based on facts which plaintiffs were never asked and never denied, or on statements which were modified by subsequent testimony not quoted in the indictment.

 Murphy's lack of probable cause is further reflected by the nature of his testimony to the grand jury. A person causing a criminal complaint to be filed does so on probable cause where he makes a full and fair disclosure of the facts and circumstances known to him and, on the basis of that disclosure, the complaint is filed. This requires the initiating or cooperating party to report all material facts known to him, including facts, which if investigated further, might lead to a determination that the accused was not guilty. If the reporting party does not in good faith disclose all material facts known to him, probable cause does not exist. *See Eans v. Grocer Supply Co.*, 580 S.W.2d 17, 21 (Tex.Civ.App.—Houston [1st Dist] 1979). *See also Lieck*, 845 S.W.2d at 937; *Diamond Shamrock*, 753 S.W.2d at 242; *Thomas v. Cisneros*, 596 S.W.2d 313, 317 (Tex.Civ. App.—Austin 1980). False statements knowingly made are also evidence of a lack of probable cause. *Lieck*, 845 S.W.2d at 938 (citing cases for that proposition).

 The government argues that Murphy provided AUSA Worley with all material information regarding his investigation of plaintiffs and therefore met the above requirements for probable cause. As discussed earlier, however, Murphy did not communicate certain material facts to Worley—Hathaway's information, for example—and provided Worley with a less than full and fair analysis of plaintiffs' testimony in the first grand jury hearing. Moreover, as with the element of causation, by focusing on what was given to Worley, the government carefully ignores Murphy's testimony before the grand jury, which the Court finds decisive. Although the Texas cases on malicious prosecution speak of the reporting party's disclosure to the prosecutor, who determines whether to file charges, in this case the grand jury, not the prosecutor, made the determination to indict Dawson and Chandler. In addition, although Murphy provided Worley with much of the evidence he collected, Worley's review of that evidence was cursory, at best, and he relied on Murphy to analyze and present the evidence to the grand jury. Worley believed that Murphy's testimony was a truthful and fair representation of the evidence. Under the circumstances, then, the existence of probable cause must be analyzed with respect to the information Murphy provided to the grand jury.

Initially, the Court notes that it has considered Murphy's testimony in both meetings of the grand jury because his false and misleading testimony at the first meeting laid the foundation for the grand jury's understanding of the case and ultimate approval of charges against plaintiffs. The evidence showed that Murphy made a number of false and misleading statements in both the first and second grand jury hearings. The Court found Murphy's explanation of those statements in the trial in this matter unconvincing and unsatisfactory. Some of the statements were directly relevant to the charges for which plaintiffs were ultimately prosecuted; others were simply intended to show plaintiffs in a bad light, thus adding to the likelihood that the grand jury would indict them.

Just as important, Murphy omitted material information that undermined the charges or that, if inquired into further by the grand jury, might have led to a decision not to return the indictment. The government argues that Murphy simply answered questions from Worley or the grand jury, and therefore cannot be blamed for omitting information he was not asked. However, Murphy did not simply respond passively to questions from Worley, but volunteered information when he chose. The volunteered information was uniformly unfavorable to plaintiffs. In addition, Murphy withheld information even when directly asked about it, for example when Worley asked him about the documents provided by Dawson's attorney. Particularly in the second grand jury meeting, where Murphy was the only witness and the jury could not be expected to remember all the details of testimony given almost eight months before, Murphy's recapitulation of only inculpatory evidence (often in a false or misleading fashion) clearly was not a fair accounting that

could have permitted the grand jury to make an unbiased determination.[9]

■ The Court does not fault Murphy for undertaking the original investigation of the Rig conversation. Certainly, the IG had a duty to investigate an alleged threat to a GSA official and ensure that if the threat was serious it was not carried out. By the time he went before the first meeting of the grand jury, however, Murphy had personally invested himself in proving plaintiffs guilty rather than seeking the truth. Unable to prove Dawson guilty on the substantive charge of the threat to injure Hathaway, Murphy then turned to proving plaintiffs guilty of perjury and obstruction of justice. Had Murphy acted simply as a neutral investigator, he would not have had to rely on misrepresentations and omissions as he did. Because a reasonable person with Murphy's knowledge would not have believed plaintiffs guilty of the crimes with which they were charged, and in view of the significant nature and number of Murphy's false and misleading statements and material omissions to the grand jury, the Court finds that he acted without probable cause.

#### 4. *Malice*

■ Malice, by its nature, almost always must be proven through circumstantial evidence. Knowing false statements and lack of full and fair disclosure are both evidence of malice. *Lieck*, 845 S.W.2d at 938; *Diamond Shamrock*, 753 S.W.2d at 242.

■ As indicated, Murphy testified falsely and failed to fully and fairly present evidence to the prosecutor and the grand jury. While any witness can be expected to make a few minor errors regarding insignificant details, Murphy's testimony was replete with misrepresentations and omissions of facts he knew would be viewed as important by the grand jury. These errors could not be explained by loss of memory considering Murphy had reviewed the relevant tapes, transcripts, and other documents shortly before the grand jury hearing and, when questioned

by Worley about particular misrepresentations, immediately corrected himself with no sign of uncertainty. Moreover, the errors and omissions were not random in effect; they consistently served to strengthen the case against plaintiffs. Going still further, Murphy interjected irrelevant information that clearly was intended to place the plaintiffs, particularly Dawson, in a bad light. The Court concludes that Murphy intentionally misled the grand jury so as to convince its members there was probable cause to believe plaintiffs were guilty of the charges in the proposed indictment.

Plaintiffs presented one possible motive for Murphy's actions, the unfair labor practice complaint they filed against him several years earlier, and the Court finds that the complaint predisposed Murphy against plaintiffs. One of the government's own witnesses corroborated that there was antagonism between Murphy, Chandler, and Dawson predating the events involved in this case. The Court is also convinced that Murphy was disappointed when he could not get enough evidence for an indictment on the underlying charge of the threat to Hathaway, and that Murphy then became determined to prove Dawson guilty of something. In any event, the Court does not believe a specific motive is essential here where, for whatever reason, Murphy's conduct evidenced ill will toward plaintiffs and a reckless disregard for their rights and the injury they would likely suffer as a result of his actions. *See Crow v. United States*, 659 F.Supp. 556 at 573 (D.Kan.1987). Plaintiffs have more than adequately proved the element of malice.

#### 5. *Liability for damages*

Having found that plaintiffs proved each of the elements of their claim of malicious prosecution by clear and convincing evidence, the Court concludes that the United States is liable to plaintiffs for damages as discussed below.

■ Plaintiffs seek compensation for past and future pecuniary losses, past and future

---

**9.** To the extent Murphy might be found not to have had an affirmative duty to inform the grand jury of any particular information discussed in the Court's findings of fact, Murphy's knowledge of such information nevertheless supports the conclusion that he could not reasonably have believed plaintiffs guilty of the crimes with which they were charged.

mental anguish and damage to their reputations. Under the FTCA, the government is liable for tort claims in the same manner and to the same extent as a private individual under similar circumstances, but may not be held liable for prejudgment interest or punitive damages. 28 U.S.C. § 2674. Under Texas law, a party who has proven malicious prosecution may recover damages for: (1) expenses reasonably incurred in defending against the charges; (2) actual pecuniary loss caused by the proceedings, such as lost wages; (3) harm to reputation; and (4) mental anguish, embarrassment and humiliation. *Eans v. Grocer Supply Co.*, 580 S.W.2d at 22–23.

 Plaintiffs established that Chandler paid $15,000.00 in attorney's fees and $904.00 for expert witnesses to defend the charges against him. Although Dawson paid approximately $28,000.00 in fees to his attorney, some of which covered the expert witnesses, the funds were provided by the union, and Dawson has no legal obligation to repay them.[10] Accordingly, the Court finds Dawson is not entitled to recovery of his attorney's fees. Because neither plaintiff kept any account of other legal costs personally expended, the Court finds their estimation of costs too questionable to support an award of damages.

Chandler and Dawson were unable to work for the GSA for approximately six months due to their prosecution. During that time, Dawson performed paid work for the union, but received somewhat less money than he would have from the GSA. The parties have stipulated that Chandler lost income of $26,236.56, and Dawson lost income of $9,204.40 as a result of their prosecution.

 Chandler and Dawson have each sought damages for other economic losses they allege they have suffered or may suffer in the future. In particular, Chandler alleges that he had prepared to become an insurance adjuster after retiring from the GSA but is now barred from that field because of his indictment for perjury. He also claims that he lost a chance to be promoted to a supervisory position within GSA and to be elected to a paid position within the union. Chandler and Dawson both claim that their credibility as representatives before the MSPB has been damaged. Dawson contends that as a result of the indictment, he lost an election for a national union office. Neither plaintiff placed any specific value on these alleged losses, and the Court finds they are too speculative to be the basis for damages.

 Plaintiffs presented evidence that they have suffered mental and emotional distress, embarrassment, and humiliation as a result of their prosecution and that their personal relationships with friends and family also have suffered. Neither man had a criminal history, and the Court is convinced that their prosecution for perjury created severe stress in all aspects of their lives.[11] Accordingly, the Court finds that plaintiffs are each entitled to damages of $50,000.00 to compensate them for these injuries.

### CONCLUSION

Plaintiffs having proven each element of their malicious prosecution claim by clear and convincing evidence, the Court ORDERS that the United States is liable to Plaintiff Chandler for the amount of $92,140.56 and to Plaintiff Dawson for the amount of $59,204.40. A final judgment consistent with this opinion shall be entered herewith. In this memorandum opinion and order, any finding of fact that should be a conclusion of law and

10. Dawson testified that he personally paid $8,000.00 of his attorney's fees. When questioned, however, he could not remember the source of that money and conceded that some of it may have been paid by the union. Because the evidence was equivocal, the Court concludes that Dawson did not expend any significant amount of his own funds for his defense.

11. Chandler presented evidence that subsequent to his prosecution he has seen a therapist on several occasions and been prescribed medication for depression. However, the evidence also showed that Chandler was receiving such therapy for several years before his prosecution and that during the prosecution itself and for some time afterwards he did not see a therapist. Therefore, although Chandler understandably suffered stress and depression as a result of his prosecution, for which he is entitled to damages, the Court finds that he is not entitled to additional recovery for his medical expenses.

any conclusion of law that should be a finding of fact shall be so considered.

### APPENDIX

Cr 4–90–042.

Filed April 11, 1990

*INTRODUCTION*

1. On August 23, 1989, at Fort Worth, Texas, a grand jury, having been duly impaneled by the United States District Court in the Northern District of Texas, was engaged in an investigation of possible violations of Title 18, United States Code, Sections 371, 372, 1503, and 1512.

2. It was a material matter to said grand jury investigation to determine whether DERRELL N. CHANDLER and HARRY L. DAWSON were witnesses concerning, and/or participants in, a conspiracy to injure Larry L. Hathaway, Personnel Officer, Office of Administration, Personnel Division, General Services Administration (GSA), in his person and property on account of his lawful discharge of the duties of his office.

3. It was a material matter to said grand jury investigation to determine whether DERRELL N. CHANDLER, defendant, had attempted to persuade Warren T. Lander to change a statement Lander had previously given government investigators.

### COUNT 1

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 23rd day of August, 1989, in the Fort Worth Division of the Northern District of Texas, and within the jurisdiction of this court, HARRY L. DAWSON, defendant herein, while testifying under oath as a witness before a grand jury of the United States sitting in Fort Worth, Texas, did knowingly and willfully make a false material declaration, that is to say:

At the time and place aforesaid, HARRY L. DAWSON, while under oath, did knowingly declare before the grand jury with respect to the aforesaid material matter as follows:

"Q. (By Mr. Worley) I mean insofar as the statement goes.

A. Insofar as the specifics that are addressed, yes. I wouldn't disagree with that as it was originally written.

One thing that I disagreed with Mr. Landers on in total—

And here again, Mr. Landers, you know, he just had back surgery. He's complaining about pain. He's on codeine and Taganol and, you know, I question whether he really knew what was going on, or even so far as my observation of him sitting out this room today. He's still in pain. Unequivocally, Mr. Landers is the one that broached the subject at the Rig.

Q. All right, sir.

A. There's no doubt in my mind in that area."

The aforesaid testimony of the defendant, HARRY L. DAWSON, was false, in that, as HARRY L. DAWSON then and there well knew, he had initiated the topic to injure and impede Larry L. Hathaway on account of his lawful discharge of his official duties.

In violation of Title 18, United States Code, Section 1623.

### COUNT 2

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 23rd day of August, 1989, in the Fort Worth Division of the Northern District of Texas, and within the jurisdiction of this court, HARRY L. DAWSON, defendant herein, while testifying under oath as a witness before a grand jury of the United States sitting in Fort Worth, Texas, did knowingly and willfully make a false material declaration, that is to say:

3) At the time and place aforesaid, HARRY L. DAWSON, while under oath, did knowingly declare before the grand jury with respect to the aforesaid material matter as follows:

"Q. Did you ask Alfred Soto to take a picture of Mr. Hathaway—

A. No, I told Landers—

Q. —and told him that you'd pay for the film?

A. No. I told Landers—Landers made a comment. He says, "Well, who can we get to do this?"

And I said, "Gee, I don't know, anybody would have to have a photograph, wouldn't they, Tim?

Soto may have chirped in and said, "Oh, I think I can take a picture."

Landers said, "I've got a picture."

Landers, the following week, which proved out to be bizarre, showed up at my Union office and handed me a little pamphlet type thing, a savings bond pamphlet thing with Larry Hathaway's picture on it. I threw it in the trash."

4. The aforesaid testimony of the defendant, HARRY L. DAWSON, was false, in that, as he then and there well knew, he, HARRY L. DAWSON, had requested Warren T. Lander to provide him a photograph of Larry L. Hathaway and the photograph was provided to him at his request.

In violation of Title 18, United States Code, Section 1623.

### COUNT 3

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 23rd day of August, 1989, in the Fort Worth Division of the Northern District of Texas, and within the jurisdiction of this court, HARRY L. DAWSON, defendant herein, while testifying under oath as a witness before a grand jury of the United States sitting in Fort Worth, Texas, did knowingly and willfully make a false material declaration, that is to say:

3) At the time and place aforesaid, HARRY L. DAWSON, while under oath, did knowingly declare before the grand jury with respect to the aforesaid material matter as follows:

"Q. Is that right? Did he say anything about it?

A. Who, Soto?

Q. No, no, Lander.

A. He came up to meet with Mr. Chandler, Derrell Chandler, on his MSPB ap-

peal after they had met. And the Union office is about a twelve by eighteen foot, with two tables this size in the middle, my desk, and Mr. Chandler's desk over in one corner. Chandler and Landers were meeting, working on his MSPB appeal for the majority of the meeting.

After they finished, Landers came around to the front of my desk and said, "I have the picture."

I said, "Okay, fine, Tim."

He handed me a brown manila envelope, pulled the—And it was a blue looking little—Not a photograph, something like you see on a leaflet or a handout. And I believe it was Larry Hathaway and the deputy regional director, Arlene Sly. I looked at it, shoved it back in the envelope. I was quite busy because I had to leave town the next week."

4. The aforesaid testimony of the defendant, HARRY L. DAWSON, was false, in that, as he then and there well knew, he, HARRY L. DAWSON, had previously requested Warren T. Lander to provide him a picture of Larry L. Hathaway and the purpose of the April 28, 1989, meeting was for Lander to give him the photograph, not for Lander to meet with Derrell Chandler.

In violation of Title 18, United States Code, Section 1623.

### COUNT 4

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 23rd day of August, 1989, in the Fort Worth Division of the Northern District of Texas, and within the jurisdiction of this court, HARRY L. DAWSON, defendant herein, while testifying under oath as a witness before a grand jury of the United States sitting in Fort Worth, Texas, did knowingly and willfully make a false material declaration, that is to say:

3) At the time and place aforesaid, HARRY L. DAWSON, while under oath, did knowingly declare before the grand jury with respect to the aforesaid material matter as follows:

"Q. Okay. The statement says, "Following the regular scheduled meeting of AFGE–L–2488 April 20, 1988," now, that's wrong, isn't it? It was 1989, was it not?

A. That's correct.

Q. Okay. So that's just an error that nobody picked up? You didn't do that to trick anybody, did you?

A. No.

Q. All right, sir. "AFGE members Tim Landers, Al Soto and myself went to dinner at the "RIG" steak house." That's what you wrote, is that correct?

A. Yes.

Q. And is that true?

A. Yes.

Q. Okay, except for the date, which is in error.

A. Sure.

Q. Okay. Then it goes on in your handwriting. It says, "During the meal Landers initially brought up—" And I believe you can read through what is struck out, which is "initially brought up," and replaced by "Soto and Dawson discussed," is that correct?

A. Yes.

Q. "—the subject that something should be done about Hathaway." Okay. Now, is that what you wrote the part that says "initially brought up?"

A. That's the part I wrote.

Q. Okay. And is that what your testimony is today?

A. Yes. I have a copy of this document, or Mr. Heiskell may have a copy of it. And I have no problem in making that an official statement and putting my signature if it'll expedite this long, drawn-out process we're in, Mr. Worley."

4. The aforementioned testimony of the defendant, HARRY L. DAWSON, was false, in that, as he then and there well knew, he, HARRY L. DAWSON, initiated the topic to injure and impede Larry L. Hathaway on account of his lawful discharge of his official duties.

In violation of Title 18, United States Code, Section 1623.

## COUNT 5

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 23rd day of August, 1989, in the Fort Worth Division of the Northern District of Texas, and within the jurisdiction of this court, HARRY L. DAWSON, defendant herein, while testifying under oath as a witness before a grand jury of the United States sitting in Fort Worth, Texas, did knowingly and willfully make a false material declaration, that is to say:

3) At the time and place aforesaid, HARRY L. DAWSON, while under oath, did knowingly declare before the grand jury with respect to the aforesaid material matter as follows:

"Q. Well, do you recall a telephone conversation wherein Mr. Lander asked you if you were serious about the threats made the evening of the 20th concerning Mr. Hathaway?

A. I've had a lot of conversations with Tim. I don't know if—Well, I don't—I don't—I don't see myself saying I was serious or not serious. You know, if he wanted to bring me a photograph, then, you know, if it makes you happy, Tim, bring a photograph. I don't know if he was serious or not. I know I wasn't serious. I don't think Al Soto was serious about it."

4) The aforesaid testimony of the defendant, HARRY L. DAWSON, was false, in that, as he then and there well knew, he, HARRY L. DAWSON, had requested Warren T. Lander to provide him with a photograph of Larry L. Hathaway on more than one occasion.

In violation of Title 18, United States Code, Section 1623.

## COUNT 6

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 23rd day of August, 1989, in the Fort Worth Division of the Northern District of Texas, DERRELL N. CHANDLER, defendant, while testifying un-

der oath as a witness before a grand jury of the United States sitting in Fort Worth, Texas, did knowingly make a false material declaration, that is to say:

3. At the time and place aforesaid, DERRELL N. CHANDLER, while under oath, did knowingly declare before the grand jury with respect to the aforesaid material matter as follows:

"Q. (By Mr. Worley) Okay. Would there be any reason for Mr. Dawson to ask Mr. Lander to secure any data for him in the spring of 1989?

A. None that I know of.

Q. Were you present in Mr. Dawson's office on April 26th, 1989, when Mr. Lander came into the office, and Mr. Dawson asked him if he was going to "get that other data for me today?"

A. I was in the office that day with Mr. Lander preparing for a tele-conference call with the Merit System Protection Board, and heard the entire conversation, but there was no conversation to that effect.

Q. Okay. You do recall being there? You do recall Mr. Lander coming in?

A. Yes. He was there with me, uh huh.

Q. Okay. And there was no conversation to the effect of Mr. Dawson saying, "Are you going to get that other data for me today?"

A. No, nothing along those lines."

4. The aforesaid testimony of the witness, DERRELL N. CHANDLER, was false, in that, as he then and there well knew, Harry L. Dawson did request Warren T. Lander to "get that other data for me today."

In violation of Title 18, United States Code, Section 1623.

### COUNT 7

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 23rd day of August, 1989, in the Fort Worth Division of the Northern District of Texas, and within the jurisdiction of this court, DERRELL N. CHANDLER, defendant herein, while testi-

fying under oath as a witness before a grand jury of the United States sitting in Fort Worth, Texas, did knowingly and willfully make a false material declaration, that is to say:

3. At the time and place aforesaid, DERRELL N. CHANDLER, while under oath, did knowingly declare before the grand jury with respect to the aforesaid material matter as follows:

Q. Sir, did you ever suggest to Mr. Lander that Mr. Dawson and his attorney, or that anybody else wanted Mr. Lander to change his story and say that he had been on medication the night of the meeting?

A. No sir. I've never heard any conversation along those lines. There was a lot of conversation brought up about that during the Merit System Protection Board hearing, because it was well documented during all those depositions in front of the Judge that Mr. Lander had had a severe back injury, that he was taking, I think, Tylenol III, cortisone shots, and codeine. The reason that I've had to play around that quite a bit was during a lot of those depositions that I took with Mr. Lander with other people, deposing other people in Mr. Lander's presence during April and May especially, there would be times that he would be so heavily medicated on codeine—I would assume its the codeine—that he would become incoherent, he didn't seem to grasp what was happening, and I'd have to call recesses so that he would be able to participate fully in them.

4) The aforesaid testimony of the defendant, DERRELL N. CHANDLER, was false, in that, as he then and there well knew, he, DERRELL N. CHANDLER, had attempted to influence and alter the testimony of Warren T. Lander.

In violation of Title 18, United States Code, Section 1623.

### COUNT 8

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 23rd day of August, 1989, in the Fort Worth Division of the Northern District of Texas, and within the

jurisdiction of this court, DERRELL N. CHANDLER, defendant herein, while testifying under oath as a witness before a grand jury of the United States sitting in Fort Worth, Texas, did knowingly and willfully make a false material declaration, that is to say:

3) At the time and place aforesaid, DERRELL N. CHANDLER, while under oath, did knowingly declare before the grand jury with respect to the aforesaid material matter as follows:

"Q. Did you ever suggest to him that, "They may want you to say that you're not sure of what was said, and that you really didn't think Dawson meant what he said, that it was just a joke?"

A. No sir, I don't recall anything like that."

4) The aforesaid testimony of the defendant, DERRELL N. CHANDLER, was false, in that, as he then and there well knew, he, DERRELL N. CHANDLER, had attempted to influence and alter the testimony of Warren T. Lander.

In violation of Title 18, United States Code, Section 1623.

### COUNT 9

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 23rd day of August, 1989, in the Fort Worth Division of the Northern District of Texas, and within the jurisdiction of this court, DERRELL N. CHANDLER, defendant herein, while testifying under oath as a witness before a grand jury of the United States sitting in Fort Worth, Texas, did knowingly and willfully make a false material declaration, that is to say:

3) At the time and place aforesaid, DERRELL N. CHANDLER, while under oath, did knowingly declare before the grand jury with respect to the aforesaid material matter as follows:

Q. I'm asking you: Did you ever tell anyone that Mr. Lander, if Mr. Lander had to testify at the grand jury, that he should

either, one, tell the grand jury that it was all a joke and that he had misunderstood because he was taking medication, or, if he wasn't going to do that, he should take the Fifth Amendment?

A. No, emphatically no, none of those conditions.

Q. You never told anybody that?

A. "No."

4) The aforementioned testimony of the defendant, DERRELL N. CHANDLER, was false, in that, as he then and there well knew, he, DERRELL N. CHANDLER, had stated to James R. Phillips, on about August 3, 1989, and to Warren T. Lander, on or about August 12, 1989, that Warren T. Lander should change his testimony to lawful authorities.

In violation of Title 18, United States Code, Section 1623.

### COUNT 10

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 23rd day of August, 1989, in the Fort Worth Division of the Northern District of Texas, and within the jurisdiction of this court, DERRELL N. CHANDLER, defendant herein, while testifying under oath as a witness before a grand jury of the United States sitting in Fort Worth, Texas, did knowingly and willfully make a false material declaration, that is to say:

3) At the time and place aforesaid, DERRELL N. CHANDLER, while under oath, did knowingly declare before the grand jury with respect to the aforesaid material matter as follows:

"A JUROR: Mr. Chandler, in your capacity of handing people's grievances and all that, you have to ferret out the truth from people that are telling different stories and all of that. We have three people that we have been talking about here. Is there any one of them that's more believable, in your opinion, than the others? And if so, why, if they are all giving three different stories?"

THE WITNESS: Okay. If I could preface my answer to you by keeping in mind that I'm still representing Mr. Lander in front of the Merit System Protection Board, and that's my duty to do so, whether I believe the man is innocent, guilty, whatever, you know. An attorney is supposed to do that. I'm certainly not an attorney but I represent him. So I have to preface what I'm going to tell you along those lines.

I've known all three of these individuals for years. Mr. Dawson, in my opinion, is a very honest, reputable person. I know he's very civic-minded, coaching little league baseball, is very active in his church, things along those lines.

Mr. Soto, I've never had occasion to doubt his word.

Mr. Lander, on the other hand—And here again, I'm going to preface this with the fact that I am representing him at the Merit System Protection Board.

The depositions that I've taken from all the people associated with him, his immediate supervisor refers to him as being untrustworthy, getting his facts confused. His next line supervisor refers to him as being untrustworthy. The head of his agency refers to him as being untrustworthy, very unreliable. Mr. Hathaway's testimony is the same. The person who represents the Agency against Mr. Lander has testified to the same.

He's been removed from his job for reasons—And here again, I'm not judging the man whether he's right or wrong, guilty or innocent on this, I still represent him, but he's been removed from his job for improperly presenting his police credentials, doing that for a profitable motive, self-serving motive. He's been suspended fourteen days for insubordination, sexual harassment, direct violation to quit sexual harassment. He's been reprimanded in writing several times before.

Knowing this, and knowing the amount of medication that he was on, the fact that I was with him for a straight three months on a daily basis almost, and knowing how that medication affected him, even to the point where I'd keep him in our office down there for a couple of hours when I'd think he couldn't drive, because during these depositions that I was giving other people we might take two, three, four hours. In some cases I'd have to interrupt part of the way through to let Mr. Lander take his medication. And after that I'd try to keep him from driving as long as I could.

I think Mr. Lander's perception throughout all of this has been one of not perceiving things right. I'm not going to certainly say—and Tim Lander is a friend of mine. I think he is an honest fellow. I think his perception has been totally messed up during the last three or four months.

4. The aforesaid testimony of the defendant, DERRELL N. CHANDLER, was false, in that, as he then and there well knew, he, DERRELL N. CHANDLER, was cognizant that medication had not adversely affected the perception or testimony of Warren T. Lander.

In violation of Title 18, United States Code, Section 1623.

### COUNT 11

1) The Grand Jury realleges all the allegations of the Introduction of this Indictment as though fully set out herein.

2) On or about the 12th day of August, 1989, in the Fort Worth Division of the Northern District of Texas, DERRELL N. CHANDLER, defendant, did knowingly and corruptly attempt to persuade Warren T. Lander to withhold and change his truthful testimony to special agents of the Inspector General's Office of the General Services Administration and the United States Grand Jury in an official proceeding relating to whether or not Harry L. Dawson had conspired with any person to injure and impede Larry Hathaway on account of his lawful discharge of his official duties, with the intent to influence, delay and prevent the testimony of Warren T. Lander in that official proceeding.

In violation of Title 18, United States Code, section 1512(b).

A TRUE BILL.

/s/ [Signature]
Foreman

/s/ Marvin Collins
MARVIN COLLINS
United States Attorney

/s/ J. Michael Worley
J. Michael Worley
Assistant United States Attorney
310 U.S. Courthouse
Fort Worth, Texas 76102
Telephone: 817–334–3291